Thomas A. Gentile, Esq.
**LAMPF, LIPKIND, PRUPIS & PETIGROW**
A Professional Corporation
80 Main Street
West Orange, New Jersey 07052
(973) 325-2100
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GUY DEL GIUDICE, Individually and on Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>        - against -<br><br>S.A.C. CAPITAL MANAGEMENT, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. HEALTHCO FUNDS, LLC, SIGMA CAPITAL MANAGEMENT, LLC, STEVEN A. COHEN, ARTHUR COHEN, JOSEPH HEALEY, TIMOTHY MCCARTHY, DAVID MARIS, BANC OF AMERICA SECURITIES LLC, GRADIENT ANALYTICS, INC., CAMELBACK RESEARCH ALLIANCE, INC., JAMES CARR BETTIS, DONN VICKREY, PINNACLE INVESTMENT ADVISORS, LLC, HELIOS EQUITY FUND, LLC, HALLMARK FUNDS, GERSON LEHRMAN GROUP, THOMAS LEHRMAN, PATRICK DUFF, and DOES 1 THROUGH 50,<br><br>                     Defendants. | DOCKET NO. _____<br><br><br>Civil Action<br><br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

       Plaintiff Guy Del Giudice, individually and on behalf of all others similarly situated, complaining against defendants S.A.C. Capital Management, LLC ("S.A.C. Capital Management"), S.A.C. Capital Advisors, LLC ("S.A.C. Capital Advisors"), S.A.C. Capital

Associates, LLC ("S.A.C. Capital Associates," and together with S.A.C. Capital Management and S.A.C. Capital Advisors, "S.A.C. Capital"), S.A.C. Healthco Funds, LLC ("S.A.C. Healthco"), Sigma Capital Management, LLC ("Sigma"), Steven A. Cohen ("Steven Cohen"), Arthur Cohen, Joseph Healey ("Healey"), Timothy McCarthy ("McCarthy"), David Maris ("Maris"), Banc of America Securities, LLC ("BAS"), Gradient Analytics, Inc. ("Gradient"), Camelback Research Alliance, Inc. ("Camelback"), James Carr Bettis ("Bettis"), Donn Vickrey ("Vickrey"), Pinnacle Investment Advisors, LLC ("Pinnacle"), Helios Equity Fund, LLC ("Helios"), Hallmark Funds ("Hallmark"), Gerson Lehrman Group ("Gerson Lehrman"), Thomas Lehrman ("Lehrman"), Patrick Duff ("Duff") and Does 1 through 50, says as follows, on information and belief and based upon the facts set forth in the publicly filed complaint in Biovail Corp. v. S.A.C. Capital Mgmt. LLC et al., Docket No. ESX L-001583 06 (Superior Court of New Jersey, Essex County) (Bernstein, J.):

## PRELIMINARY STATEMENT

1.      This is a class action on behalf of all persons and entities who sold the securities of Biovail Corporation ("Biovail" or the "Company") on or after June 5, 2003 (the "Class Period"), and who were damaged thereby, seeking to pursue remedies under the federal securities laws, including the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This action arises from a massive, illegal and continuing stock market manipulation scheme, which targeted the common stock of Biovail and severely harmed its investors, and which has resulted in immense ill-gotten profits for S.A.C. Capital and other extremely powerful hedge funds.

3.      At the core of this scheme was defendants' perpetration of a massive and fraudulent disinformation campaign attacking the stock of Biovail and other targeted publicly-

traded companies, including the preparation of ostensibly objective, but in fact biased, analyst reports; defendants' accumulation of short positions in the stock of those companies, i.e., bets that the stock prices would decline; and defendants' subsequent unleashing of the disinformation campaign and biased analyst reports on the unsuspecting trading public, thus bringing about the sought-after stock price declines and the resulting immense profits for defendants and commensurate harm to the plaintiff and the Class.

4.     Defendants' scheme thus attacked the very basis for the financial markets -- the free and fair disclosure and dissemination of information concerning publicly-traded stocks.

5.     S.A.C. Capital, a hedge fund conglomerate, is at the center of this illegal scheme. S.A.C. Capital was founded and is run by Steven Cohen, who has immense power in the financial markets.  Through S.A.C. Capital, Steven Cohen controls at least $7 billion in capital, with his trading activity regularly accounting for 3% of the daily volume of the New York Stock Exchange ("NYSE") and 1% of the NASDAQ daily volume.

6.     Biovail is a specialty pharmaceutical company specializing in the development, manufacture, and marketing of controlled-release medications for the treatment of chronic medical conditions.  Biovail operates facilities in Canada and the United States and employs over 1,700 people worldwide.

7.     In spring 2003, when Biovail in fact was poised for substantial growth, S.A.C. Capital and the other defendants launched a devastating attack on Biovail's stock.  In furtherance of their scheme, after having taken short positions, defendants manipulated the market for Biovail stock and artificially lowered its stock price by, among other things, disseminating materially false and misleading information concerning Biovail and tortiously interfering with Biovail's business.

8.     One of defendants' primary methods in executing their attack on Biovail's stock was to "ghost write" negative and false analyst reports concerning Biovail.  Defendants issued these reports through Camelback and Gradient, which purported to provide independent securities analysis to subscribers.

9.     In fact, Camelback and Gradient were anything but independent.  Instead, Camelback and Gradient permitted hedge fund clients such as S.A.C. Capital to author reports -- nearly always negative -- on companies, and then publicly release the report as a product of its own independent research and analysis.  These reports-for-hire were referred to internally at Camelback and Gradient as "hatchet jobs" and typically were released at the behest of short-selling hedge funds.

10.     The attack on Biovail's stock provides a prototypical example of defendants' abuse of analyst reports -- an abuse all the more shocking in the wake of recent Wall Street analyst scandals.  In June 2003, S.A.C. Capital commissioned a hatchet job on Biovail from Camelback.  S.A.C. Capital provided virtually all of the information and opinions found in the report, which grossly distorted and misstated the facts concerning Biovail's business and accounting.  The report was merely transcribed by an inexperienced Camelback "analyst" who had only recently graduated college and held no investment analyst credentials.  S.A.C. Capital instructed Camelback to hold the report for over a week so that S.A.C. Capital and other defendants could establish short positions in Biovail stock.  Camelback then issued the report on June 20, 2003, falsely representing that the content constituted its own independent, unbiased analysis that resulted in an "F" grade for Biovail.

11.     Over the next several weeks, other purportedly independent analysts including defendant Maris, disseminated, at S.A.C. Capital's direction, negative and false information

concerning new Biovail drugs, including Wellbutrin XL, and defendants did not stop at false analyst reports.   Through defendant Gerson Lehrman, defendants and those with whom they were working in concert went so far as to pay doctors to provide quotes to the financial press falsely implying that Biovail had implemented a program to bribe doctors to prescribe Cardizem LA.   This complete fabrication was disseminated to the financial markets through The Wall Street Journal and Barron's and subsequently throughout other financial media.

12.     By the end of July 2003, defendants' attack on Biovail's stock was having its intended effect:  in those six weeks, Biovail's stock price declined 20%.  Defendants, however, were not satisfied.  S.A.C. Capital had Camelback issue another negative report at the end of July, again with a false and misleading description of Biovail's business, including the false Gerson Lehrman reports of bribery, and an additional negative Camelback report in September 2003.

13.     At S.A.C. Capital's further instigation, in early October 2003, Maris of BAS issued two false reports on Biovail based upon the Camelback hatchet jobs.  In an attempt to lend credence to the attacks on Biovail, Maris retained three accounting experts, who he expected would rubber stamp that attack.  When those accountants failed to support his preconceived conclusions, Maris blatantly misrepresented their findings.  Maris's false reports, together with yet another S.A.C. Capital instigated Camelback hatchet job, led to an additional 14% drop in the stock price of Biovail by October 2003.

14.     Similar orchestrated attacks continued during the spring of 2004 by which time Biovail's stock had been driven down over 50%, its business reputation devastated, its ability to access capital markets severely curtailed, its ability to do business substantially impaired, and hundreds of its employees laid off.  Investors in Biovail stock were saddled with huge losses,

while the short-selling defendants reaped enormous profits at their expense.

15.     Plaintiff brings this class action to recover no less than $4 billion in compensatory damages that the members of the Class have suffered, as well as punitive damages for defendants' egregious misconduct.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

19.     In connection with the actions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

20.     Plaintiff Guy Del Giudice resides at 12217 Sweetleaf Court, Keeler, Texas.  On August 19, 2003, plaintiff Del Giudice purchased 340 shares of the common stock of Biovail at the price of $40.91 per share.  On October 20, 2004, plaintiff Del Giudice sold his 340 shares of the common stock of Biovail at the price of $19.32 per share.

21.     Defendants S.A.C. Capital Associates, S.A.C. Capital Management, and S.A.C. Capital Advisors, directly or indirectly, operate and manage various hedge funds (including

defendants S.A.C. Healthco and Sigma), are organized under the laws of Delaware, and maintain their principal places of business at 72 Cummings Point Road, Stamford, Connecticut.

22.     Defendant S.A.C. Healthco is a hedge fund organized under the laws of Anguilla, British West Indies, with its principal place of business at 540 Madison Avenue, New York, New York.

23.     Defendant Sigma is a hedge fund organized under the laws of Delaware, with its principal place of business at 540 Madison Avenue, New York, New York.

24.     Defendant Steven Cohen is a citizen and resident of Connecticut, and resides at 30 Crown Lane, Greenwich, Connecticut.  Steven Cohen is the founder and operator of S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C. Healthco, and various other hedge funds that he owns, controls, or otherwise directly or indirectly operates.  Steven Cohen controls, dominates, and operates such hedge funds without regard to the putatively separate legal form and existences of each such that each is the alter ego of the other and of Steven Cohen.  In addition, as set forth herein, Steven Cohen and S.A.C. Capital abused the corporate form by using the entities they control and operate to perpetrate a fraud and injustice.

25.     Defendant Healey is a citizen and resident of New York residing at 17 East 17th Street, New York, New York.  During the times relevant to this complaint, he was a manager of S.A.C. Healthco operating under the direct direction and control of Steven Cohen.  Healey has since left S.A.C. Healthco to form and operate a hedge fund called Healthcor that is, directly or indirectly, 40% owned by Steven Cohen and the hedge funds he manages.

26.     Defendant Arthur Cohen is a citizen and resident of Connecticut residing at 67 Old Hill Road, Westport, Connecticut.  During the times relevant to this complaint, Arthur

Cohen, along with Healey, managed S.A.C. Healthco under the direct direction of Steven Cohen. Arthur Cohen has since left S.A.C. Healthco to form and operate a hedge fund called Healthcor that is, directly or indirectly, 40% owned by Steven Cohen and the hedge funds he manages. Prior to working at S.A.C. Healthco, Arthur Cohen was employed at Tiger Management, a hedge fund engaged in substantial "short selling" of stock that was dissolved on or about March 30, 2000.

27.     Defendant McCarthy is a citizen and resident of New York residing at 114 East 36th Street, New York, New York.  From early 2003 through early 2005, McCarthy worked at S.A.C. Healthco under the direction of defendants Healey and Arthur Cohen and Steven Cohen. Prior to working at S.A.C. Healthco, McCarthy worked with defendant Maris at Credit Suisse First Boston ("CSFB").  In early 2005, McCarthy left S.A.C. Healthco to return to CSFB, where he is currently employed.  (Defendants S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C. Healthco, Steven Cohen, Arthur Cohen, Healey, and McCarthy are collectively referred to herein as the "S.A.C. Defendants" or "S.A.C.").

28.     Defendant BAS is a limited liability corporation organized under the laws of the state of Delaware, with its principal place of business located at 335 Madison Avenue, New York, New York 10017.  Defendant BAS is a registered dealer-broker with the Securities and Exchange Commission.  At all pertinent times, defendant BAS employed defendant Maris as an analyst.

29.     Defendant Maris is a citizen and resident of the state of New Jersey residing at 8 Bucklin Road, Colt's Neck, New Jersey.  Maris is the BAS analyst covering specialty pharmaceuticals, including Biovail, and prior to joining BAS in 2003, Maris worked at CSFB with defendant McCarthy.  At all pertinent times, defendant Maris was an employee of defendant

BAS, and all actions by defendant Maris were for an on behalf of himself and BAS.

30.    Defendant Gradient is an Arizona corporation, with its principal places of business during the time period alleged in this complaint located at 14614 North Kierland Boulevard, Scottsdale, Arizona and Summit, New Jersey.

31.    Defendant Camelback is an Arizona corporation, with principal places of business during the time period alleged in this complaint located at 14614 North Kierland Boulevard, Scottsdale, Arizona and Summit, New Jersey.   Camelback is wholly-owned, operated, dominated, and controlled by defendants Gradient, Bettis, and Vickrey without regard to the putatively separate legal form and existence of each such that each is the alter ego of the other. In addition, as set forth herein, Gradient, Bettis, and Vickrey abused the corporate form by using Camelback and the other entities they control and operate to perpetrate a fraud and injustice.

32.    Defendant Pinnacle is a hedge fund organized under the laws of Arizona, with its principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

33.    Defendant Helios is a hedge fund organized under the laws of Arizona, with its principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

34.    Defendant Hallmark Fund is a hedge fund organized under the laws of Arizona, with its principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

35.    Defendant Bettis is a founder, co-owner, President, and CEO of defendants Camelback and Gradient.  Bettis is a citizen and resident of the state of Arizona residing at 9820 East Thompson Peak Parkway, Unit #608, Scottsdale, Arizona.  In addition, Bettis is a founder,

owner, investor, and manager of various hedge funds and hedge fund advisors, including defendants Pinnacle, Helios, and Hallmark.

36.     Defendant Vickrey is a founder and co-owner of defendants Camelback and Gradient, and an officer and the Editor-in-Chief of Camelback.  Vickrey is also a founder, owner, investor, manager, and advisor of various hedge funds, including defendants Pinnacle, Helios, and Hallmark.  Vickrey is a citizen and resident of the state of California residing at 7345 Corte Tomillo, Carlsbad, California.   (Defendants Gradient, Camelback, Bettis, Vickrey, Pinnacle, Helios, and Hallmark are collectively referred to herein as the "Camelback Defendants.")

37.     Defendant Gerson Lehrman is a Delaware corporation, with its principal place of business at 850 Third Avenue, New York, New York.  Gerson Lehrman acts as a "matchmaker" between a network of individuals and entities with experience and expertise in a broad range of disciplines and clients who seek to consult with those experts.

38.     Defendant Lehrman is a co-founder of Gerson Lehrman and a former Gerson Lehrman co-CEO and director.  Prior to founding Gerson Lehrman, Lehrman worked for Tiger Management.  Lehrman is a citizen and resident of the District of Columbia residing at 4401 Dexter Street Northwest, Washington, D.C.

39.     Defendant Duff is a managing director of Gerson Lehrman.  Duff resides at 275 Durham Place, Glen Rock, New Jersey.  Prior to joining Gerson Lehrman, Duff was a Senior Managing Director and Management Committee member at Tiger Management where he worked closely with Defendant Arthur Cohen.  (Defendants Gerson Lehrman, Lehrman, and Duff are collectively referred to herein as the "Gerson Lehrman Defendants.")

40.     The names and capacities of defendants Does 1 through 50 are presently unknown

to plaintiff.  Plaintiff is informed and believe that Does 1 through 50 include the limited and general partners of the other defendants, including the S.A.C. Defendants, as well as affiliates, co-venturers, co-conspirators, and/or aiders and abettors of the other defendants.  Plaintiff also is informed and believes that Does 1 through 50 include unknown Canadian and American financial analysts and portfolio managers who participated in the scheme, enterprise, and misconduct alleged in this complaint.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Class, consisting of all those who sold the securities of Biovail after  June 5, 2003 (the "Class Period"), and who were damaged thereby.  Excluded from the Class are defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant or group of defendants has or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Biovail shares were actively traded on the NYSE and the Toronto Stock Exchange ("TSX").  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are hundreds or thousands of members of the proposed Class.  Record owners during the Class Period and other members of the proposed Class may be identified from records maintained by Biovail or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in securities class actions.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by defendants' wrongful conduct in violation

of the law, as set forth herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the defendants' actions constitute violations of the United States securities laws;

b.     whether statements made by the defendants to the investing public misrepresented material facts about the business, operations, and management of Biovail;

c.     whether statements made by the defendants misrepresented that certain defendants were providing independent securities analysis when, in fact, their analysis was not independent and was intended to aid and assist specific market participants; and

d.     to what extent the members of the Class have sustained damages as a result of defendants' wrongdoing, and the proper measure of those damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## STATEMENT OF FACTS

A.     **The Illegal Scheme**

47.    This action arises from a massive, illegal and continuing stock market manipulation scheme, which has targeted and severely harmed Biovail's investors and which has resulted in immense ill-gotten profits for S.A.C. and the other defendants.

48.    A critical element of the scheme was and remains "short-selling."  A "short seller" or "short" borrows stock from a lender and sells the borrowed stock, expecting that the price of the stock will decline, and that he will therefore be able to purchase the stock later at a lower price, return the stock to the lender and pocket the profit.  The scheme also employed various "short-equivalent" trading strategies -- such as the purchase of "put" options -- that likewise profited from future declines in the stock price of targeted companies.  Under the scheme, the defendants, in concert with one another and others, drove down the price of stocks they had shorted or in which they had assumed short equivalent trading positions by, among other means, disseminating materially false and misleading information, orchestrating negative news articles, commissioning, "ghost writing" or influencing negative reports from biased and corrupted stock analysts, and using such manufactured misinformation to engender investor suspicion and legal and regulatory scrutiny.

49.    The defendants, in concert with one another and others, also exploited advance access to material non-public confidential information that was shared with them in violation of various fiduciary relationships or otherwise misappropriated, including, for example, information concerning certain FDA drug approval decisions, the timing of company product launches or business developments, trading and other investment activities of clients, and the timing and substance of stock analyst recommendations.  The defendants traded on such material non-public

information by shorting stocks before the release of unfavorable information, reducing short positions and/or taking long positions before the release of positive information, and executing various trading strategies otherwise designed to exploit trading volume and volatility surrounding the release of the anticipated information. For example, as set forth in detail below, the defendants, in concert with one another and others, ghost-wrote purportedly independent analyst reports which were then held before release until the defendants could take short and other trading positions based on the report's expected impact upon release and also regularly received advance notice of the timing and substance of other analyst reports -- which were similarly tailored to suit the defendants' trading objectives -- to enable them to likewise "front run" the release of those reports.

50.    This scheme targeted many dozens and likely hundreds of publicly-traded companies, including Biovail. These targeted companies suffered enormous damage as a direct consequence of the scheme, which directly and materially interfered with each company's ability to conduct business, implement strategic plans, secure necessary capital, and maintain employee morale, productivity, and recruiting. In addition, and equally severe, the scheme inflicted enormous financial harm on investors in the targeted companies who collectively lost many billions of dollars as a direct consequence of this stock manipulation scheme -- billions of dollars lost to the defendants who reaped correspondingly enormous profits at the expense of those innocent investors.

**B.    The Criminal Enterprise**

51.    This illegal stock manipulation scheme was devised and executed by an association, associations, and associations-in-fact comprised of, among others, the S.A.C. Defendants, the Camelback Defendants, the Gerson Lehrman Defendants, defendant Maris,

defendant BAS, the Doe defendants, and others known and unknown (collectively, the "Enterprise"), including the following:

1.     **The S.A.C. Defendants**

52.     S.A.C. derives its name from the initials of its founder and leader Steven A. Cohen.  Steven Cohen is known in the industry as the "most powerful trader on Wall Street you've never heard of" because of the "highly secretive and stupendously successful S.A.C. funds he controls."  Through S.A.C., Steven Cohen collectively controls no less than $7 billion and regularly accounts for 3% of the NYSE daily volume and 1% of the NASDAQ daily volume. These investment dollars are channeled through several different "portfolio companies" or funds -- including a core fund, a global diversified fund, a health-care fund, and defendant Sigma fund (comprised of Steven Cohen's personal monies), all of which Steven Cohen manages in a highly integrated and hands-on fashion.

53.     Steven Cohen's market influence, however, extends much further than the S.A.C. funds he directly controls.  In addition to the billions he controls directly through S.A.C., he has also invested billions more in non-S.A.C. funds, including funds formed by former S.A.C. managers who are required to agree as a condition of S.A.C. employment to permit Cohen to hold up to a 50% interest in any hedge funds they form after leaving S.A.C.   Consequently, Cohen personally has one of, if not the, most powerful market-moving capabilities on Wall Street.

54.     In the first 12 years since he formed S.A.C. Capital Advisors, Steven Cohen had regularly generated incredible returns in the range of 40% per annum.  Reflecting this extraordinary performance, investors pay him a 50% success fee, far above the 20% industry standard.  Consequently, Steven Cohen's annual S.A.C. management fee regularly has exceeded

$400 million, which is in addition to profit he earns on his own monies invested in Sigma and other S.A.C. and non-S.A.C. funds.  As is explained hereafter, the notable exception to S.A.C.'s extraordinary success occurred in 2002, when its returns declined from approximately 40% per annum to approximately 14% and Steven Cohen's fees plummeted to "only" $100 million.

55.    Unlike most hedge funds, S.A.C. seeks no volume discount on its enormous trading costs and commissions, and consequently pays over $150 million in annual commissions -- making it one of Wall Street's top ten trading customers.  In addition, S.A.C. frequently purchases secondary offerings, that include substantial built-in brokerage commissions for banks, and thereby further increases S.A.C.'s already substantial financial leverage and influence. Cohen uses this enormous financial leverage to support S.A.C.'s trading strategies by demanding access to material non-public information from the financial institutions with whom S.A.C. does business, including non-public inside information concerning public companies and other clients to whom those institutions owe fiduciary and other duties of non-disclosure, and the substance and timing of reports and recommendations being issued by analysts for those institutions. Financial institutions and their employees understand -- because S.A.C. has told them -- that a failure to provide such information will result in the loss of S.A.C.'s substantial business.

56.    S.A.C. uses its enormous financial leverage to not only extract and trade on material non-public information but also to actually dictate the substance and timing of certain material information being disseminated to the market.  For example, S.A.C. regularly uses its substantial financial leverage to direct and influence the analysis and recommendations of purportedly independent stock analysts and the time such analysis and recommendations are issued to the market, without any disclosure of the material conflict of interest reflected by its leverage and influence.  Like S.A.C.'s demand for material non-public information, it is

understood that failing to provide influence and control over the substance and timing of analyst reports will result in the loss of S.A.C.'s substantial business.

57.    To maximize the impact of its access to material non-public information and control and influence over the substance and timing of analyst reports, S.A.C. focuses on thinly-traded, small to modestly capitalized stocks in volatile sectors like pharmaceuticals and bio-technology.   Stock prices in these sectors are more easily manipulated and special advanced access to, and influence over, information is more readily exploited because of the lower market capitalizations and trading volumes in these sectors, as well as the fact that stock prices depend heavily on intangibles and unknowns such as the outcomes of clinical trials and new product launches.   S.A.C. rarely invests in such companies long-term but instead pursues short-selling or event-driven trading strategies based on S.A.C.'s access to -- and control over -- material non-public information, and the substance and timing of stock analyst reports.

58.    To maximize the use of S.A.C.'s substantial market influence, under Steven Cohen's direction, S.A.C. places extreme pressure on its traders, managers, employees, and agents to produce at all costs.   S.A.C. generates such intense pressure by, among other things, imposing what is described internally at S.A.C. as an "eat what you kill" compensation scheme under which compensation depends on individual trading performance and not -- as is the industry norm -- on the fund's overall performance.   Those who fail to produce are quickly terminated:   "At S.A.C., you either perform or you're dead," according to one public report by an insider.   Such policies ensure that those who remain at S.A.C. are willing and capable of doing whatever it takes to secure the extraordinary performance Steven Cohen demands.   The enormous pressure to perform at S.A.C. was particularly acute in 2003 after Cohen had experienced what insiders called his "very disappointing" 14% returns and $100 million in

management fees in 2002.

59.    From spring 2003 to the present -- as it had in the past -- the S.A.C. Defendants orchestrated short-selling "bear attacks" on numerous publicly traded companies, including Biovail.  They prosecuted these attacks on Biovail and other targeted companies by, among other things, paying, pressuring, and otherwise influencing purportedly independent analysts to disseminate materially false and misleading information about the business, accounting, and corporate governance of these targeted companies.  These materially misleading misinformation campaigns devastated the targeted companies by tarring their business reputations, eroding investor confidence, and devastating management and employee morale and focus, and thereby artificially driving down the stock price to the enormous benefit of the short-selling S.A.C. and the extreme detriment of the companies and their legitimate investors.

## 2.    **The Camelback Defendants**

60.    In the wake of the scandals, lawsuits, and regulatory investigations involving corrupt stock analysts issuing untrue reports to support their financial institution's investment banking business, a new niche of third-party boutique firms emerged claiming to provide purportedly "independent" stock analysis.  Defendants Bettis and Vickrey attempted to exploit this emerging market niche by forming, owning, and operating defendants Camelback and Gradient.  Bettis and Vickrey promoted Camelback and Gradient as, among other things, "independent research firm[s] providing both analyst-written research work (Earnings Quality Analytics and Equity Incentive Analytics) and quantitative stock ratings for institutional clients (Gradient Factor Suite)."   Consistent with this description, the Camelback Defendants represented that their reports and analyses -- which purported to focus on earnings and forensic accounting issues -- were the work product of an experienced staff of CPA's, CFA's, M.B.A.'s

and Ph.D.'s, "reflect[ed] [their] judgment" and were completely "independent" and free from "bias." Indeed, they applied for and received certifications from industry organizations representing that they were independent of investment banking services, money management, or customized research services. In addition, they represented that all of their clients had equal access to their reports, which they represented were released to all clients simultaneously immediately upon completion.

61.     In truth, however, the Camelback Defendants' service was a sham and such representations were false. Their quantitative models -- which purported to calculate investment ratings based on various financial data and mathematical programs -- were knowingly operated with unreliable and incomplete data feeds and without the most fundamental programming safeguards necessary for basic quality control and reliability. Despite repeated warnings from internal and external experts concerning the need for such stringent data quality safeguards, Bettis and Vickrey refused to implement such safeguards because doing so would have interfered with one of their central marketing objectives of maximizing the number of companies covered (however badly) so as to provide the greatest possible likelihood that they could point to successful (albeit truly random) price movement predictions. Indeed, employees referred to the Camelback Defendants' quantitative models internally as "the random number generator" because they typically got as many calls wrong as right. Indeed, defendant Bettis quickly abandoned the use of Camelback's core "earnings quality" quantitative model in his management of defendants Pinnacle, Helios, and Hallmark, even though the Camelback Defendants continued to promote that model to the investors as an effective stock selection tool.

62.     The Camelback Defendants' qualitative analyst reports were even more misleading. As a threshold matter, the purported staff of so-called "analysts" preparing these

reports were not experienced CPA's, CFA's, M.B.A.'s, or Ph.D.'s as represented but recent college graduates with no meaningful, let alone remotely adequate, experience in forensic accounting or investment analysis. The Camelback Defendants required no such experience, however, because, like the quantitative models, they were not interested in the accuracy of their reports but instead only in their ability to generate business by marketing a large library of reports so as to also secure putatively correct (albeit entirely random) performance predictions.

63. In addition, the reports were hardly the product of "independent" unbiased accounting or other analysis for a host of reasons. First, the Camelback Defendants lied to customers and other market participants that they did not manage money. In fact, while issuing their purportedly independent and unbiased research, Bettis and Vickrey were also managing the Pinnacle, Helios, and Hallmark hedge funds from the offices of Camelback and Gradient and trading in the very stocks they were covering through those funds and personally. Indeed, one desk in the Camelback/Gradient office had a phone for Camelback and Gradient research customers at one end and a phone at the other end of the same desk for clients of these hedge funds Bettis, Vickrey, and other Camelback and Gradient employees were managing.

64. Furthermore, the reports they issued were almost exclusively negative to suit their core business objective of servicing short-selling hedge funds interested in driving stock prices down. In order to secure such clients, the Camelback Defendants permitted hedge funds to "ghost write" so-called "custom" reports that were referred to internally by certain Camelback employees and externally by certain hedge fund customers as "hatchet jobs." When a custom report was ordered, the hedge fund client told the putative Camelback "analyst" what issues to write about and what to say about those issues. The "analyst" contributed no meaningful analysis to the report but merely served as a scrivener of the client's stated position. That the

reports were not legitimate unbiased research or reflected the Camelback Defendants' true beliefs or honest opinions was apparent from numerous facts, including the fact that the short-selling hedge funds dictated all or substantially all of the information and conclusions contained in the reports, and target companies were never asked to comment on, explain, or clarify any of the concerns or uncertainties frequently raised by the reports.

65.    The Camelback Defendants also misrepresented that reports were issued simultaneously to all clients upon completion. In fact, once completed, a customized hatchet job would be held until the commissioning hedge fund instructed that it be released. This delay was to allow the paying hedge fund and others it was working with (and the hedge funds controlled by Bettis and Vickrey, including defendants Pinnacle, Helios, and Hallmark, as well as Bettis and Vickrey personally) to front-run the reports by taking short and other positions in anticipation of their release contrary to their representations to their clients. Only after the hedge fund instructed the Camelback Defendants to release the reports were they sent to the other Camelback/Gradient clients.

66.    In promoting their "custom" service to short-selling hedge funds, the Camelback Defendants touted their ability to amplify the impact of the negative reports through various contacts. In order to maximize the negative impact of these putative analyst reports, the Camelback Defendants would also send the reports to the targeted company's largest shareholders through a subscription service called BigDough.com and to a stable of financial media outlets and journalists receptive to rebroadcasting the content of the reports. Indeed, the Camelback Defendants aggressively courted media outlets to promote their analysis and the interests of their short-selling clients. For example, Camelback/Gradient clients and defendants David Rocker and Rocker Partners own 10% of the influential internet site TheStreet.com, which

frequently cited Camelback/Gradient reports, including those that had been ghost written or otherwise influenced by short-selling hedge funds including Rocker Partners.  Moreover, current MarketWatch contributor Jon Markman was a paid investment advisor for the Pinnacle hedge fund operated by the Camelback Defendants, promoted their analysis in his writing, and co-authored a subscription stock selection newsletter with Bettis.  Likewise, other influential financial columnists had close relationships with Vickrey, remote access to Camelback's website and internal data, and frequently spoke with Vickrey and Bettis while writing about companies about which the Camelback Defendants had issued "customized" reports for short-selling hedge funds.

67.     Well-informed shareholders of targeted companies who received unsolicited copies of these bogus research reports frequently responded with outrage at the report's obvious reckless disregard for the truth.  In many other cases, however, the reports had the desired effect of causing shareholders to reduce or liquidate their positions.  For example, as set forth below, hatchet jobs S.A.C. commissioned on Biovail caused one of its top three institutional shareholders to liquidate its entire position and other substantial strain on Biovail's investor confidence.  The Camelback Defendants celebrated these developments internally as great achievements and used them to demonstrate the effectiveness of their custom hatchet jobs to other hedge funds from whom they were seeking business.

68.     The Camelback Defendants permitted hedge funds to use their names to ghost-write custom reports for several reasons.  First, custom "hatchet jobs" provided a source of revenue and business development that they realized was not otherwise available to them for truly independent and objective "forensic accounting" analysis.  Second, participating in such manipulative schemes allowed them to also "front-run" the market movement that their reports

and the efforts of these powerful short-selling hedge funds would cause.  Third, doing work for major market participants such as S.A.C. made it easier to promote their services to other potentially interested financial institutions.

69.     This marketing strategy was successful.  As set forth below, after a series of S.A.C. hatchet jobs on Biovail and other pharmaceutical and biotechnology companies that were ghost written by S.A.C. Healthco manager and defendant McCarthy, Steven Cohen personally called the Camelback Defendants to express his gratitude for their work and S.A.C.'s intention to expand the relationship going forward.  In addition, the Camelback Defendants began providing custom hatchet jobs for numerous other hedge funds.  These hatchet jobs, ghost written or substantially influenced by short-selling hedge funds, include reports on, among others, Celgene, Cardinal Healthcare, Inc., Intermune, Inc., ImPath, Inc., Biolase, Take-Two Entertainment, Leap Frog, King Pharmaceuticals, Inc., Accredo Health, Inc., Swift Transportation Co., Overstock.com, and Taser.

70.     Numerous employees of the Camelback Defendants raised concerns about the misrepresentations being made about analyst credentials, the mischaracterized lack of any financial interest in the stocks being covered, the lack of reliability in the trading models, the lack of objectivity in the customized reports, and the holding of reports for select hedge fund clients.  Although defendants Vickrey and Bettis acknowledged internally the inappropriateness of such practices when confronted by such complaints, the only action they took was to ultimately orchestrate the discharge (on complete pretenses) of those raising such objections to silence discord concerning what they had determined would be a central part of the Camelback/Gradient business.

3.      **David Maris and BAS**

71.     David Maris is currently the analyst covering specialty pharmaceuticals for defendant BAS.  Prior to joining BAS in 2003, Maris worked at Credit Suisse First Boston ("CSFB") with defendant McCarthy.  Maris has built a reputation as a powerful "sell-side" securities analyst whose negative reports can devastate a company's stock price.  This reputation is based in part on his critical coverage of Irish pharmaceutical company Elan, whose financial troubles and declining stock price made enormous profits for short-selling hedge funds, including Tiger Management at which S.A.C. Healthco manager Arthur Cohen and Gerson Lehrman's Thomas Lehrman and James Lyle worked together at the time.  Maris is a favorite of short-selling hedge funds who view him as a strong ally and voice in their efforts to drive down stock prices in targeted companies by disseminating negative information and analysis about those companies.  Maris also views these short sellers as allies in that they are frequently large clients of BAS, provide him with material non-public information for use in his reports and otherwise with his BAS clients, and because it is in both Maris's and the short sellers' interests to see the price decline in companies they have targeted for criticism or sold short, respectively.

72.     After Maris joined BAS and McCarthy began working at S.A.C. Healthco, they continued to work together and collaborate with respect to the work McCarthy was doing at S.A.C.  One of the stocks they collaborated on was Biovail, which Maris understood S.A.C. and other larger hedge fund clients of BAS were targeting for a prolonged short-selling attack beginning in or about June 2003.  As part of their collaboration, Maris provided McCarthy with special advanced access to, and input into, his research reports and internal analysis and advance notice of the timing and substance of those reports before they were issued.  In addition, he disseminated a stream of grossly misleading information and analysis in frequent written and

oral reports, on the internet, at investor conferences, and in direct and indirect communications with investors, the press, and regulators.

73.     Maris undertook such actions because (a) he hoped to be credited and compensated by BAS with bringing in or maintaining lucrative hedge fund business, including from, among others, S.A.C., Itros Capital, SuttonBrook Capital, Ram Partners, and Ziff Brothers Investments, all of whom he understood were shorting Biovail; (b) these and similar short-selling hedge funds shared with him material non-public information they had secured by exercising their substantial financial leverage that he could use to make his recommendations appear more prescient; and (c) he understood that Biovail was about to be the subject of a concerted short attack by these and other powerful hedge funds and saw enlisting in this assault as an opportunity to repeat his career-making performance with Elan and further solidify his self-proclaimed title of "the Howard Stern of Wall Street."

### 4.     The Gerson Lehrman Defendants

74.     Gerson Lehrman promotes itself as a company that "provides customized research services for knowledge-driven businesses" and is known in the hedge fund industry as a "matchmaker" and information conduit.  In exchange for substantial sums of money, Gerson Lehrman puts hedge funds in contact with, or communicates on behalf of hedge funds with, numerous persons and entities in various disciplines.  Although such services can constitute entirely legitimate due diligence, Gerson Lehrman also frequently facilitates both the illegal collection of material inside information for trading purposes and the dissemination of false and misleading information for illegal market manipulation purposes.

75.     For example, Gerson Lehrman regularly matches hedge funds with, or communicates on their behalf with, doctors involved in clinical trials, the results of which will

determine whether a pharmaceutical will receive FDA approval or not.  From these discussions, Gerson Lehrman and its hedge fund clients frequently secure material non-public information concerning the likelihood of FDA approval and use that information in their trading strategies in that company's stock.  Conversely, Gerson Lehrman regularly works with hedge funds that are shorting stocks to manufacture negative information about the companies being shorted and disseminate that information into the market to manipulate a company stock price downward.

76.    With respect to Biovail, Gerson Lehrman on behalf of its hedge fund clients orchestrated the publication of at least two negative and inaccurate articles that appeared virtually simultaneously in The Wall Street Journal and Barron's concerning the Cardizem LA launch, a product central to Biovail's strategic business plan.  Although the articles purported to be the product of independent journalistic research and honest medical opinions, the doctors critically quoted in the articles were -- unbeknownst to the authors -- employed by hedge funds (most or all through Gerson Lehrman).  Indeed, the most critical doctor quoted inexplicably appeared in both articles and misrepresented in each that he had been approached by Biovail and asked to accept payments (i.e., bribes) to prescribe Cardizem LA.

77.    In addition to its affiliated activities on behalf of hedge funds, the Gerson Lehrman Defendants engage in front-running and insider trading -- individually and through Gerson Lehrman Brokerage Services -- by engaging in stock trading based on the information they receive on behalf of, and from, clients, and their understanding of the clients' expected trading plans.

**5.    Perry Capital**

78.    Perry Capital is a hedge fund operating in New York, New York.  Perry Capital is a client of the Camelback Defendants and Gerson Lehrman.  During the summer of 2003, Perry

Capital acquired more than one million put options on Biovail stock and was paying doctors through Gerson Lehrman who were being quoted critically in the negative Barron's and Wall Street Journal articles concerning Cardizem LA.  In January 2006, the SEC notified Perry Capital that it was contemplating an enforcement action based on Perry Capital's manipulative short-selling of securities.

> 6.    **The Rocker Defendants**

79.    David Rocker is the primary owner and manager of hedge fund Rocker Partners operating in Millburn, New Jersey.  Rocker Partners is a Camelback client that has ordered "hatchet jobs" to support short positions on numerous companies including Overstock.com, and participated in the manipulative short-selling by other Enterprise members.  David Rocker is also the largest shareholder in the financial news and commentary website TheStreet.com, which frequently rebroadcasts reports and analysis of the Camelback Defendants -- including those commissioned by Rocker on companies he and his fund are shorting -- and frequently quotes Bettis and Vickrey concerning companies being shorted by defendants and other members of the Enterprise.

> 7.    **Other Enterprise Members**

80.    The Enterprise also includes other members known and unknown who participated in and facilitated the scheme, including but not limited to Canadian stock analyst Andre Uddin, who collaborated with the S.A.C. Defendants and the Camelback Defendants with respect to Biovail, Itros Capital, SuttonBrook Capital, Ram Partners, and Ziff Brothers Investments, all of which collaborated closely with Maris and in some cases the Camelback Defendants.

C.    **Biovail**

81.    Biovail is Canada's largest pharmaceutical company based on market capitalization.  At times relevant to this complaint, it developed and marketed products in the cardiovascular, central nervous system, and pain management therapeutic areas, and had particular expertise in oral controlled, extended-release drug delivery technology.  At times relevant to this complaint, Biovail's product portfolio contained over twenty-five pharmaceuticals including hypertension drugs Cardizem CD and Cardizem LA; angiotension converting enzyme inhibitors (Vasotec and Vaseretic); Ultram ER; topical herpes treatment Zovirax; and extended release anti-depressant Wellbutrin XL.  Through early 2002, Biovail had predominately marketed its products in the United States by licensing them to U.S.-based third party marketing organizations.  Based on this successful business model and ongoing opportunistic acquisitions of new product rights, Biovail grew steadily, with revenues increasing from $112 million in 1998 to $788 million in 2002.

82.    In early 2002, Biovail was again poised for growth and was developing its own sales and marketing capability that would provide a fully-integrated business platform for exponentially greater future growth.  Central to these immediate and longer-term objectives was Biovail's planned launch of an improved version of hypertension drug Cardizem CD, which was called Cardizem LA.  The financial markets considered Cardizem LA financially and "psychologically critical" to Biovail for at least two reasons.  First, a successful Cardizem LA launch would further substantiate Biovail's controlled release technology and department strategy.  Second, a success would substantially blunt if not reverse the anticipated erosion in Cardizem CD sales from increasing generic competition.  Third, Cardizem LA was slated to be Biovail's first substantial effort at fully-integrated operations.

28

83.     Given the critical importance of the Cardizem LA launch, in the summer 2002 Biovail retained the international consulting firm of McKinsey & Company ("McKinsey") to assist in devising a successful product launch.  McKinsey's brief was broad and its efforts substantial.  It assembled a full-time on-site project team consisting of McKinsey professionals and Biovail representatives and immediately assumed definitive hands-on management control over all aspects of the Cardizem LA launch, including responsibility for developing sales, and operational strategies, reorganizing Biovail's sales forces, and centralizing that force at the headquarters of BPI in Bridgewater, New Jersey.

84.     By summer end, McKinsey had determined that Cardizem LA's long-term success would be substantially improved by a post-launch clinical global trial research study that would gather real-world clinical data demonstrating its effectiveness.  Because Biovail had no experience in such programs, McKinsey recommended that it retain a firm that did.  After considering proposals from leading firms in the field, McKinsey recommended retaining Quintiles Transactional Corporation ("Quintiles") because it was the preeminent firm in the field with the most relevant experience.  Biovail accepted that recommendation and authorized Quintiles to develop every element of the clinical experience research program.  As it had with McKinsey, the company made clear it intended to rely on Quintiles' recommendations once they had been fully reviewed, vetted, commented on, and approved by McKinsey.

85.     Quintiles ultimately recommended a program whereby physicians matching certain profiles could participate in a Cardizem LA clinical experience research study involving up to 15 of their patients, each of whom would receive coupons for a free supply of the drug for participating in the program.  Quintiles also informed Biovail that participating physicians and staff should be offered fair market compensation for the time they spent administering the

program and compiling and recording the requested data.  Consequently, with the advice of McKinsey and other outside legal and medical experts, the program provided a $250 administrative fee to physicians for completing the baseline questionnaire and consulting agreement, up to no more than $1,000 for the physician's participation assuming a maximum of 15 patients entered and completed the program (earned in installments as program milestones were attained), and an additional $50 for office personnel.  The clinical experience research program was called "Proving LA through Clinical Experience" or "PLACE" for short.

86.     After the extraordinary effort and costs developing and vetting the PLACE program, Biovail announced in March 2003 that Cardizem LA would be launched the following month.  At that launch, the PLACE program and Cardizem LA's importance to Biovail's future were emphasized.  With the Canadian launch the previous month of an improved version of Teveten (Teveten HCT), an April Cardizem LA launch, a May acquisition of Ativan, the July launch of Zovirax cream, and the expected imminent approval and launch of other new and improved products, especially an extended-release version of anti-depressant Wellbutrin (Wellbutrin XL), Biovail was uniquely poised for substantial growth and the start of fully-integrated operations.  Indeed, the market's reaction to these many positive developments pushed Biovail's stock price to a 52-week high of over $50 in early June 2003 with analysts calling it "an exciting growth play," predicting it would hit $60 in the next year, and rating it "accumulate."

**D.      The Biovail Bear Raid**

87.     As Biovail's stock price rose to a 52-week high, the defendants targeted Biovail for an illegal short-selling attack.  The defendants targeted Biovail because of its rising stock price and the fact that it was particularly vulnerable to the defendants' scheme due to its moderate market capitalization and trading volume, volatile market sector, business complexity, and the

importance of its new product launches and associated strategic initiatives.   Under these circumstances, the defendants understood that it could cause a substantial decline in Biovail's stock price and generate substantial trading volatility and volume by manufacturing false concerns and doubts in the market about Biovail's business, accounting, and products.

88.     Accordingly, the defendants commenced a concerted misinformation campaign in which its members disseminated bogus analyst reports; manufactured grossly misleading and untrue press; spread false rumors and misinformation about Biovail's business fundamentals, accounting, and insiders; and took various steps with that misinformation to generate regulatory scrutiny.   Central to the scheme was the plan to use trumped-up false and misleading criticisms of Biovail's accounting and business practices to undermine investor confidence despite strong business prospects that the defendants could not effectively assail.   Defendants that took the lead in this campaign were, among others, the S.A.C. Defendants, the Camelback Defendants, Maris, Perry Capital, and the Gerson Lehrman Defendants.

### 1.     The Bogus June Camelback Report and Regulatory Rumors

89.     The scheme to undermine investor confidence in Biovail and its business by spreading unfounded criticisms about its accounting and business practices began in or around Spring 2003.   These efforts initially manifested themselves in various false and misleading market rumors that began to appear at that time, including rumors of non-existent investigations into Biovail's accounting and negative rumors concerning Cardizem LA sales practices.   At the same time, S.A.C. and the Camelback Defendants agreed to issue putative Camelback research reports highly critical of Biovail's accounting and business that would actually be ghost-written by defendant McCarthy on behalf of S.A.C.   In early June, McCarthy dictated virtually all of the information and opinions to be included in the first of these Biovail "hatchet jobs" to a young

inexperienced Camelback "analyst" with no investment analyst credentials or material forensic accounting experience.  A draft report containing McCarthy's dictated analysis bearing a legend indicating that it reflected the client's position was sent to McCarthy for additional comment and approval.  After McCarthy made additional edits, a final report was prepared that was virtually identical to the draft with the legend identifying S.A.C.'s role deleted so that the final report reflected only that it was a product of the Camelback Defendants' purportedly independent research.

90.     McCarthy instructed the Camelback Defendants, and they agreed, to hold the report for approximately 3-7 days so that S.A.C. and other members of the Enterprise, known and unknown, could establish short or short-equivalent positions and other trading strategies in anticipation of the report's release.  After SAC, the Camelback Defendants, and other Enterprise members had taken their Biovail short or short-equivalent positions, on June 20, 2003, McCarthy instructed Camelback to issue the report -- which assigned Biovail an "F" grade based on false, misleading, and unfounded accounting criticisms.

91.     The putative Camelback report on Biovail was materially false and misleading in numerous respects, including but not limited to the following.  First, the report was falsely portrayed as the product of Camelback's unbiased and objective selection process and analysis, when in fact it was generated at the direction of, and written by, S.A.C. for the purpose of driving the price of Biovail stock down.  Second, the report was not being released immediately and simultaneously to all of Camelback's subscribers as Camelback represented, but was instead being released only after S.A.C. (and the Camelback Defendants) had taken their short positions.

92.     Finally, the report's purported conclusions lacked any reasonable or factual basis, did not reflect the honestly held opinions of the Camelback Defendants or any research, let alone

independent unbiased research, but was instead based on a series of grossly distorted and materially misleading factual assertions and opinions made for the sole purpose of advancing S.A.C.'s market manipulation objective.   These materially false, misleading, biased, and unfounded assertions included, but were not limited to, the following:

- The report misrepresented without any reasonable factual basis that Biovail's "strategy to transform the company into a fully-integrated pharmaceutical firm" might be "unraveling" and "running out of steam" because "revenue growth slowed dramatically in 2002 as a result of declining product sales."   In fact, revenue growth in 2002 was 35.1% higher than in 2001, product sales actually grew by 24% from 2001, and the company was in the process of launching four major new products as part of the strategic transformation the report falsely claimed was "unraveling."

- As further support for the false assertion that the transformation was "running out of steam," the report misrepresented without any reasonable good faith basis that Biovail's revenue mix was deteriorating without mentioning that the imminent new product launches would materially improve that revenue mix.

- The report misrepresented without any reasonable factual basis that Biovail's research and development ("R&D") commitment was declining when in fact such expenditures had increased from $17.5 million in 1998 to $52 million in 2002 with projections for 2003 between $75 million and $90 million.

- The report misrepresented without any reasonable factual basis that this non-existent decline in R&D expenses would substantially limit Biovail's ability to grow organically by ignoring, among other things, the fact that Biovail had launched Cardizem LA in April, and was scheduled to launch Zovirax Cream in July and Wellbutrin XL in Q3, 2003.  In addition, the report opined without any good faith basis or even any explanation that the 72% increase in R&D expenses in the most recent quarter and projected $75 to $80 million in 2003 would be "too little, too late."

- The report misrepresented without any reasonable factual basis that Biovail's R&D expenditures were declining as a percentage of its revenues and that this evidenced a waning commitment to research and a "significant competitive disadvantage."   This assertion was materially false and misleading because it included in the ratio revenues derived from acquired products for which R&D costs had been expended prior to the acquisition and could not be recorded as Biovail R&D expenses under Generally Accepted Accounting Principles ("GAAP").  Contrary to the report's false assertion, Biovail's R&D expenses as a percentage of non-acquired product revenue were increasing dramatically as was R&D and amortization as a percentage of all revenue.  Both of these ratios, which

fairly and accurately depict the relationship between Biovail's R&D and revenues, were omitted from the report.

- That the omission of such ratios was the product of a bad faith effort to distort Biovail's accounting is evidenced by the fact that the report later accuses Biovail of not properly including those same acquired R&D expenses in its earnings analysis, even though GAAP prohibited any such inclusion.  The source of this criticism was not an honestly held belief in the assertion but rather a committed bias to skew the analysis in a way necessary to generate a negative result.

- The report misrepresented without any reasonable factual basis that Biovail's R&D expenditures as a percentage of revenue lagged its "peers" and thus put Biovail at a competitive disadvantage.  This analysis was materially false and misleading because the purported "peers" used for the comparison were not remotely approximate comparables for Biovail since their business models were fundamentally different.  A reasonable peer analysis would have included companies such as Biovail competitor Andrx with whom Biovail's R&D expenditures were completely in line.  Moreover, the report's assertion was false, misleading and unfounded because if acquired R&D expenses were included in the metric -- as the report elsewhere did where it had a negative impact -- Biovail would have had one of the highest commitments to R&D as a percentage of revenue.

- The report misrepresented without any reasonable factual basis that product revenues were materially declining, and the report failed to mention the substantial increase in revenue that would accompany the four new products being launched at or about that time.  Indeed, to justify this misleading omission, the report claimed one of those new launches had already begun and was faltering when in fact it would not begin for another month.

- The report misrepresented without any reasonable factual basis that Biovail's earnings were not sustainable based on several misrepresentations and unfounded grounds.  For example, the report charged that one component of earnings for the last quarter was properly attributed to an unsustainable "active share repurchase program" when no stock had been repurchased in over a year.  Similarly, it challenged the sustainability of Biovail's earnings based on the materially false assertion lacking a reasonable basis that Biovail's tax rate was unsustainably low.

- The report misrepresented without any reasonable factual basis that Biovail's financials utilized an inappropriately and unsustainably low tax rate compared to its "peers."  This assertion was materially false and misleading because the "peers" bore no reasonable comparison to Biovail's unique tax circumstances or corporate tax structure.  In truth, Biovail's tax rate was entirely in line with similarly structured companies and had been maintained for more than a sufficient time to demonstrate its sustainability.

- The report misrepresented without any reasonable factual basis that Biovail had a history of "aggressive accounting" that "materially alter[ed] the firm's reported financial performance by shifting profits to the current period (at the expense of future periods)."  The basis for this accusation of aggressive accounting was that in 2001 Biovail restated certain prior quarters, which the report claimed showed that in those prior quarters Biovail had failed "to comply with generally accepted accounting principles" and thereby overstated "top line revenues -- arguably the most important metric followed by analysts and investors."  This assertion was materially false and misleading because at the time those prior quarters were reported on they were properly accounted for under GAAP and were subsequently restated only because subsequent changes in the governing accounting rules mandated such adjustments to reconcile historical reporting with the newly imposed rule.  (SAB 101).

- The report misrepresented without any reasonable factual basis that Biovail had used its "substantial discretion" in accounting for in-process R&D to manipulate earnings -- and that Biovail had in fact used this method to manipulate earnings -- when, in fact, Biovail had no discretion over these mandatory write-offs under GAAP and the written-off values were set by independent third-party valuation experts.

- The report misrepresented without any reasonable factual basis that Biovail was experiencing "severely negative free cash flow" when in fact Biovail was generating significant positive cash flows.  In order to support this gross distortion, the report ignored actual cash flows and instead misleadingly and without any reasonable basis used the cash available after discretionary acquisitions as the only measure of cash flow.

- The report cited its materially misleading cash flow analysis to support an equally misleading and unfounded concern that Biovail would suffer a liquidity crisis.  In fact, by any reasonable measure, Biovail had ample liquidity with enormous cash flows, a substantially undrawn $600 million credit facility, and a credit rating just below investment grade.

- The report misrepresented Biovail's debt ratios by citing only debt to equity and not debt to EBITDA or interest coverage both of which are standard credit metrics which showed low leverage.

- The report misrepresented without any reasonable factual basis that Biovail had a "significant risk" of "low quality receivables" when, in fact, Biovail had better quality receivables than almost any other company in the industry with most receivables due from three of the largest and most credit-worthy pharmaceutical companies and three similarly substantial and credit-worthy major wholesalers.

- The report misrepresented without any reasonable factual basis (or explanation) that Biovail had overstated the value of its substantial intangible assets.

- The report misrepresented without any reasonable factual basis that there was a "high likelihood of product . . . write down[s]." This incorrect assertion was based on several material misrepresentations and unfounded assertions of fact. First, citing what it described as a "sharp drop in sales," the report asserted that Biovail's accounting had overstated Cardizem CD's and Zovirax's effective product life. This statement lacked any reasonable factual basis and was materially misleading because the described drop was expected, disclosed, predictable, and fully accounted for in the drugs' acquisition prices and amortization schedules. Second, the report stated falsely that the newly launched Cardizem LA would face "strong competition from other products in the Cardizem family (i.e., CD, SR, and XL)" when, in fact, Biovail owned the rights to CD, SR was not actively being marketed by anyone anywhere, and no such thing as Cardizem "XL" existed. Third, the report predicted Biovail would also have to write down its drug Vaseretic because it had "ceased promoting" it when, in fact, Biovail had never promoted that product and accounted for its product life and projected revenues based on that fact. Fourth, the report stated that Zovirax had generic competition, which it did not.

93. These and other gross misrepresentations of fact and unfounded statements were the product of -- and could only be reasonably viewed as -- a reckless disregard for the truth consistent with a specific intent to deceive in order to serve S.A.C.'s market manipulation scheme. Further evidencing this reckless indifference and deceptive intent is the fact that the Camelback Defendants never called Biovail to seek input, comment, or the answers to any of the many grossly distorted facts and opinions contained in the report even though this is a standard industry practice and common sense to ensure fair and accurate analysis. No such comment was sought because the objective of the report was not to present accurate and honest analysis, but to manufacture bogus accounting issues that S.A.C. could use to erode investor confidence even in the face of strong business fundamentals and performance.

94. S.A.C., the Camelback Defendants, and other Enterprise members, agreed and did aggressively disseminate the Camelback report to major Biovail investors, including Class members, potential investors, other analysts, including Maris, and other market participants to amplify the negative impact of the report's materially false and misleading assertions.

2.      **The Maris Wellbutrin XL Report**

95.      While collaborating with the Camelback Defendants, McCarthy was also closely collaborating with Maris.  Indeed, alerted by several hedge funds that the defendants were launching a short-selling attack on Biovail, Maris contacted the leading financial journalists with whom he had dealt during his work on Elan to begin the process of securing similar coverage of what he understood would be an aggressive campaign to drive Biovail's stock down and possibly the company out of business, and in which he intended to participate by issuing extremely negative reports.

96.      Accordingly, on June 26, 2003, Biovail and Glaxo received a highly-anticipated "approvable" letter from the FDA for Wellbutrin XL, which meant that FDA approval of this important drug would likely be secured after a limited number of remaining modest tasks were addressed.  As a result, the price of Biovail stock began to rise.  Although BAS had not yet authorized Maris to begin coverage of Biovail, he nevertheless began his support of the short attack by issuing a research report on Biovail competitor Andrx as a vehicle to comment negatively on this undeniably positive Biovail development.  In that report, Maris knowingly and materially overstated the difficulty Biovail would have receiving final approval and asserted the approvable letter would likely result in a delay in the receipt of approval without any reasonable basis for that assertion and without any belief in its truth, and only because he believed it would advance the interests of the hedge funds with whom he was working in concert.

97.      Maris and McCarthy continued collaborating on this issue going forward.  For example, on July 22, 2003, McCarthy informed Maris of the material non-public inside information that Glaxo and Biovail had "in hand" a class 1 or class 2 letter from the FDA concerning the Wellbutrin XL approval and that Glaxo Wellcome would likely announce this

fact the following day.  Maris and McCarthy discussed the potential significance of this information to Biovail's price and passed it along to BAS clients and S.A.C. adjusted their trading positions based on it.

### 3.     The July 11, 2003 Bogus Camelback Report

98.     On July 11, 2003, McCarthy directed the Camelback Defendants to issue another report on Biovail discussing the disclosure of a two year-old "forward sale" transaction by a Biovail director and knowingly and falsely asserting without any reasonable basis that Biovail had improperly failed to disclose this transaction earlier.  Although this dated transaction was not remotely material to Biovail's current condition, had never before nor at the time required disclosure, and did not remotely approach the relevance of far more current and material developments concerning Biovail, McCarthy and the Camelback Defendants used it as a pretext to repeat their prior negative recommendations on Biovail and raise further unfounded concerns regarding its reputation and practices.  Again, McCarthy, the Camelback Defendants, and other Enterprise members agreed and did aggressively disseminate the Camelback reports to major Biovail investors, including Class members, potential investors, other analysts, including Maris, and other market participants to aggravate the negative impact of those reports.

### 4.     The Attack On Cardizem LA

99.     In addition to disseminating materially false and misleading information concerning Biovail's accounting, the defendants also targeted its Cardizem LA launch and strategic transition to a fully-integrated pharmaceutical company.  Thus, beginning at or around the same time as the efforts to spread rumors concerning Biovail's accounting, defendants also began spreading negative rumors that the PLACE clinical experience study was an inappropriate means to boost Biovail's financials (when in fact PLACE prescriptions were free).

100.    Like the attack on Biovail's accounting, the effort to sabotage Cardizem LA initially manifested itself in general marketplace rumors.  This whispering campaign however reached an apex on or about July 20-21, 2003 when The Wall Street Journal and Barron's published reports raising the identical (albeit unfounded) assertion that the PLACE clinical experience research study was nothing more than a method of paying doctors to write prescriptions.  The Wall Street Journal article was entitled "Biovail Is Paying Doctors Prescribing New Heart Drug," and the Barron's article was entitled "Pill Pusher: Drug Maker Biovail Sparks Controversy By Paying Doctors to Write Prescriptions."  In addition, the articles referred to the purported concerns about Biovail's accounting that the defendants had previously manufactured and disseminated throughout the market.

101.    That these negative articles were orchestrated is apparent from the fact that the two articles were written by two different writers, told essentially the same story, quoted overlapping sources, and appeared virtually simultaneously.  Moreover, it is apparent that Enterprise members and other hedge funds were involved in this orchestration.  The articles echoed the purported accounting concerns contained in the ghost-written Camelback reports and every doctor quoted critically about the PLACE program was connected to hedge funds either directly or through Defendant Gerson Lehrman.

102.    For example, the most critical comments came from a 79 year-old New York cardiologist Emanuel Goldberg, who was inexplicably quoted in each purportedly independently researched article.  In The Wall Street Journal, Goldberg was quoted as saying that Biovail told him " 'If you give [Cardizem LA] to 15 patients, you'll get $1,000'" but he refused because" 'it's not clear why you're really giving the drug.'"  In the Barron's article, Goldberg also claimed he had been offered $1,000 to write 15 prescriptions, and said "I told them that it was unethical" but

"they still asked me if I'd do it."  Moreover, although he said he had not actually even considered the program let alone agreed to participate in it, he nevertheless reported that he doubted the "seriousness of the research component in Biovail's program."

103.   Goldberg's story was categorically false.   Biovail never asked Goldberg to participate in the PLACE program let alone proposed paying him $1,000 to write prescriptions. Indeed, Goldberg has since admitted that he was not, in fact, contacted by Biovail, and that Gerson Lehrman paid him to provide quotes for The Wall Street Journal and Barron's.

104.   Goldberg's fabricated story was orchestrated by the Gerson Lehrman Defendants, for whom Goldberg worked regularly, on behalf of members of the Enterprise paying Gerson Lehrman to assist in generating negative publicity about Cardizem LA.   Indeed, of the five doctors to whom negative comments were attributed in these articles, at least four were consultants with Gerson Lehrman or otherwise did work for hedge funds.  For example, hedge fund Perry Capital was "consulting" with North Carolina cardiologist Joseph Guzzo through Gerson Lehrman just days before he was quoted negatively in the Wall Street Journal article.  At the same time, Perry Capital was accumulating no less than 1.1 million put options on Biovail with which it stood to gain enormous profits in the event Biovail's stock price declined. Likewise, Gerson Lehrman consultant Dr. Peter Goodfield was quoted negatively in the Barron's article, and the most critical doctor after Goldberg -- Cleveland cardiologist Dr. Eric Topol -- was directly employed as an advisor by hedge fund Great Point Partners which was also directly or indirectly trading in Biovail at the time and would later gain notoriety for making tens of millions of dollars shorting Merck stock based on Dr. Topol's recommendations concerning Vioxx.

105.   As a direct result of the approximately first six weeks of the short-selling attack

(from early June through the publication of the orchestrated articles concerning Cardizem LA), the materially misleading unfounded negative rumors, reports, and news articles eroded the price of Biovail's stock by 20%. In addition, within weeks of the Barron's and Wall Street Journal articles, the United States Attorney's Office for the District of Massachusetts, on behalf of the Office of Inspector General, commenced an investigation into the PLACE program that would ultimately have a further substantial negative impact on investor and marketplace confidence and ultimately -- as set forth more fully herein -- Biovail's effort to successfully launch Cardizem LA and become a fully integrated pharmaceutical company.

5.    **The Bogus July 31, 2003 Camelback Report**

106.    In or about July 2003, McCarthy informed the Camelback Defendants that while S.A.C. was pleased with the over 20% decline in Biovail's stock price since early June and had made enormous profits based on that decline, S.A.C. was looking to drive the stock price far lower still. Consistent with this objective, on July 31, 2003, McCarthy again had Camelback issue a report McCarthy dictated that was rife with materially false and misleading information, including the following:

- The report reiterated the unsubstantiated and materially misleading assertion that "the firm's strategy of developing into a 'full-service pharmaceutical company' has failed to produce tangible benefits to shareholders" when in fact the implementation of that strategy was just beginning.

- The report misrepresented without any reasonable factual basis that "management has obscured" the extent of this non-existent failure by "aggressive accounting tactics."

- The report misrepresented without any reasonable factual basis that Biovail's reported earnings per share were "vastly overstated" and "artificially inflate[d]" by improperly excluding various items such as acquired in-process research and development costs, when in fact GAAP required that such charges be separately identified and written off.

- The report misrepresented without any reasonable factual basis that Biovail would

not be able to sustain its rate of earnings based on several materially misleading rationales and misrepresentations. For example, the report falsely asserted that declining product sales were indicative of a failure in Biovail's new product launches when in fact such declines were (and had been disclosed as) the temporary and expected dislocation associated with the transition from older legacy products to the new products then being set for launch.

- The report misrepresented without any reasonable factual basis that Biovail was "significantly more leveraged" than in previous quarters.

- The report rebroadcast the unfounded and false reports that Biovail was pursuing a program "to pay doctors for prescribing Cardizem LA."

- The report reiterated the previous false and unfounded predictions of "imminent risk of a product rights write-down, and frequently negative free cash flow."

107.    Again the false and unreasonable unfounded assertions were not honestly held beliefs or analyses of the Camelback Defendants but were offered instead to advocate the views and interests of the hedge funds paying for the report. This bias and indifference to the truth is evidenced in the fact that the Camelback Defendants did not contact the company to seek information or clarification concerning any of the issues to be discussed or concerns raised in this materially misleading report. Again also, S.A.C., the Camelback Defendants, and other Enterprise members agreed and did aggressively disseminate the Camelback reports to major Biovail investors, including Class members, potential investors, other analysts, including Maris, and other market participants to aggravate the negative impact of those reports.

**6.    The Bogus September 16, 2003 Camelback Report**

108.    During September, McCarthy continued to work with the Camelback Defendants to orchestrate an additional negative research report on Biovail. On or about September 16, 2003, Camelback issued an Earnings Quality Analytics Alert that reiterated -- without any new information -- its materially false and misleading assertions about Biovail's increased dependence on lower quality sources of revenue, negative cash flows, low sustainable earnings,

earnings overstated by nonrecurring gains, unsustainably low tax rates, inappropriate off-balance

sheet R&D entities, in-process R&D charges, and declining core product sales.  In addition, the

Camelback report added the following materially false and misleading statements:

- The report misrepresented without any reasonable factual basis that Biovail had established a new entity to inappropriately shift research and development costs off balance sheet when, in fact, this entity was not an off-balance sheet entity but was a consolidated entity.
- The report misrepresented without any reasonable factual basis that an increase in Biovail's receivables balance in 2002 reflected deteriorating payments and past earnings manipulation when in fact the increase merely reflected sizable co-promotion payments and thus reflected not a decrease in payments or manipulation, but a substantial increase in amounts earned, due, and substantially collected.

- The report misrepresented without any reasonable factual basis that expanding inventory levels reflected a "risk of obsolete inventories" when in fact it reflected the build-up of inventory for Biovail's new product launches.

- The report misrepresented without any reasonable factual basis that Biovail had "fragile free cash flows" when in fact Biovail's cash flows were far greater than those of its closest competitors.  Camelback made the materially misleading and provocative assertion that "free cash flow declined over 200%, as acquisitions jumped an alarming 2144%" when in fact the only reason such numbers were so high was because in the prior year the report used for comparison Biovail had elected to make no acquisitions and therefore did not consume any of its cash flow for acquisitions.

- The report misrepresented without any reasonable factual basis that Biovail's acquisitions were "alarming" or unsound.

- The report falsely asserted without any reasonable or factual basis that the increased intangible asset base indicated that "the company has overpaid for recently acquired subsidiaries and product rights" resulting in "both assets and book value [being] overstated."  In fact the intangibles value had increased because Biovail had used its cash flow to acquire more revenue generating assets, while Camelback offered, and had, no reasonable basis for concluding any such acquisitions were overvalued.

109.    As before, this report did not contain or reflect an unbiased independent opinion

but a result oriented service to the Camelback hedge fund clients.  Highlighting this bias, the

Camelback Defendants again did not contact Biovail to review their analysis, held the report

once it had been completed until S.A.C. instructed them to release the report, and, in agreement with S.A.C. and other Enterprise members, aggressively disseminated the report, including to Maris, to magnify its negative impact.

>7.      **The Maris October 8 and 10, 2003 Reports**

110.    McCarthy's collaboration with Maris intensified as Maris prepared to finally initiate coverage on Biovail when it reported its third quarter results.   At the time, Maris informed McCarthy and other Enterprise members that he intended to initiate coverage with an extremely negative report and a sell rating based on the same or very similarly unfounded accounting criticisms McCarthy had written in S.A.C.'s bogus Camelback reports as a reason for recommending a sell in the face of Biovail's substantial business prospects.   McCarthy and Maris understood that such criticisms from Maris would reach a far broader audience and have a far greater impact on Biovail and its stock price than the prior rumor campaign and ghost-written Camelback reports previously disseminated.

111.    To accomplish this preordained objective, Maris initially retained two outside accounting experts he hoped would parrot the accounting criticism previously manufactured in S.A.C.'s Camelback reports and provide him a basis for recommending that investors sell their Biovail stock despite otherwise solid business projections that Maris could not dispute.   This plan, however, hit a snag when the first two retained experts submitted reports that were not consistent with this preordained objective.   Indeed, the first expert informed Maris that the requested accounting analysis was "meaningless" for Maris's stated purpose of evaluating Biovail's investment value because it did not address the value of Biovail's products, intangible assets, and business model.   The first expert further stated that the analysis required to answer the question concerning Biovail's investment value was whether Biovail management could succeed

in executing its business model, and that the conclusion of that analysis "might very well be yes" but could not be determined from Maris's requested analysis.  While the second expert rendered no opinion on the meaningfulness of the request, his characterization nevertheless also torpedoed Maris's preordained objective by grading Biovail's accounting as a B- and noting that while some of the accounting was "moderately aggressive," the enormous detail Biovail provided in its public disclosures permitted any competent analyst to easily adjust for any such aggressiveness. Moreover, even with respect to the criticisms they did offer, the experts were not consistent.

112.    Realizing that the reports were insufficient to sustain his intended conclusion and, in fact, directly contradicted that conclusion, Maris and his staff undertook to salvage their efforts by talking those experts into offering additional comments supporting Maris's opinion. The second expert, however, actually modified his conclusions during that process to up his grade of Biovail's accounting to a B+.

113.    An objective analyst would have accepted these conclusions, and abandoned his thesis that the share value that Biovail's business would otherwise justify should be discounted due to accounting concerns.  Maris, however, was not objective, but committed to a negative report citing accounting concerns that he knew would harm Biovail's business and substantially depress its stock price to the extreme benefit of his short-selling hedge fund supporters and detriment to Biovail's legitimate investors and Banc of America Securities' less privileged customers.

114.    Accordingly, Maris scrambled to locate a third putative expert to provide some basis for asserting that accounting issues could justify discounting what would otherwise be a valuation requiring a buy rating.  Although this third expert's report made clear -- as did his predecessors -- that his analysis was not an effort to, and should not be used to, opine about

Biovail's investment value, and only offered modest accounting criticism, under pressure from Maris and his staff he also offered that the accounting left "an impression that the opaqueness in its financial reporting is perhaps a reflection of a deeper problem associated with the execution of its business model."  Leaping at this "impression" of "perhaps" an associated problem with the business as a slim read upon which to base their completely result-oriented objective, Maris assistant David Lohman reported to Maris that "our man came through for us."

115.    Nevertheless, Maris realized that he could not -- as originally planned -- include the entirety of the experts' reports, conclusions, or grades in his own report because doing so would reveal they did not support his desired outcome.  Accordingly, Maris decided that he would "summarize" the reports in a manner that would support his position.

116.    Maris's plan to use the misrepresented accounting criticisms to initiate negative coverage at or around the time Biovail announced its third quarter results in late October was overtaken by Biovail's announcement in early October that it would miss earnings guidance for the quarter due to a number of factors, including an accident involving a truck carrying one of the initial shipments of recently approved Wellbutrin XL.  Although at the time of the accident, Biovail had requested that trading in its stock be halted until it could determine exactly what happened, the New York and Toronto stock exchanges nevertheless instructed Biovail to issue an immediate press release so that trading could begin without delay.  In that announcement, Biovail stressed -- and objective analysts and rating agencies correctly agreed -- that the quarter "miss" was not the product of a fundamental change in the company's outlook or business.  Nevertheless, fed by the substantial uncertainty that the defendants' misinformation campaign had generated about Biovail up to that point and additional manipulative efforts, the market reacted far more negatively than it would otherwise have to the announcement resulting in a

substantial drop in the stock price.

117.    The badly exaggerated drop in Biovail's stock price caused by the defendants'
misinformation campaign resulted in additional enormous profit for the short-selling S.A.C.
Defendants, Camelback Defendants, and other Enterprise members.   On October 6, 2003,
McCarthy reported S.A.C.'s success to Maris who responded "I hope you will make them even
more money."   Maris also informed McCarthy and other Enterprise members that he was
preparing to rush his planned negative report out to capitalize on Biovail's negative news and
intended to issue it on October 8, 2003.

118.    As promised and always intended, on October 8, 2003, Maris initiated coverage
on Biovail with a report containing numerous glaring errors concerning basic company
information that reflected his indifference to the facts relating to Biovail's business.  The report,
as well as a more detailed follow-up report issued on October 10, 2003, was materially false and
misleading in numerous respects.

119.    First, the reports led with a materially false and misleading description of the
purported findings by the three accounting experts, which the October 8, 2003 report made clear
were the central basis for Maris's conclusion that Biovail's stock value should be substantially
discounted compared to its peers and thus be valued as a sell.  Maris did not include the experts'
actual written reports, their letter grades, or their complete findings and conclusions.  Maris
avoided such full disclosures because they would have gutted his plan to cite these accounts as a
reason to sell Biovail stock.

120.    Moreover, Maris's alternative purported "summary" grossly distorted the actual
opinions given to Maris because it included only the criticisms, badly exaggerated those
criticisms,   and   omitted   all   explanatory,   mitigating,   or   exculpatory   information   or

characterizations, including most importantly the experts' ultimate conclusions and grades which were not consistent with Maris's depiction. By way of example, the Maris summary contained the following material misrepresentations and omissions concerning the conclusions he had received:

- It did not disclose that the summary was not, as it represented, the product of objective unbiased analysis but was instead the product of a preordained objective to serve the interests of those hedge funds with which Maris was in concert.

- It did not disclose that the third expert was retained only after the first two did not provide the necessary answers and it misrepresented that Maris accepted the first three experts who agreed to participate.

- It did not disclose that the first accountant had (a) concluded that the grade and analysis was "meaningless" for Maris's stated purpose; (b) opined that the material investment issue was not accounting technicalities but "whether the $1.25 billion of purchased goodwill, intangibles and intercompany instruments . . . [could] be managed so as to create a future profit stream commensurate with the cost of capital;" and (c) concluded that "the answer very well may be yes" to that material question but could not be determined through Maris's requested accounting analysis.

- It failed to disclose that the second expert initially graded Biovail's accounting as a B- and then as a B+ and further opined that while some of Biovail's accounting was "moderately aggressive" in places, Biovail provided so much detail in its public disclosures that any analysts could "perform analytical adjustments and fine tune these aggressive methods."

- It failed to disclose that the third expert had likewise stated that his analysis was not appropriate for Maris's stated purpose.

- It carefully edited out innumerable inflammatory and argumentative points that revealed that the most critical expert lacked credibility and professionalism.

- It used the summary format to portray a consensus among the experts when in fact their opinions varied widely and were so inconsistent as to preclude any reasonable summary of one set of conclusions.

121. Second, Maris's October 10, 2003 report also included his own equally distorted analysis that included, among others, the following materially false and misleading and not reasonably based characterizations:

- It misrepresented and materially exaggerated a purported decline in Biovail organic sales by, among other things, excluding from the analysis substantial organically-developed product sales and inexplicably included non-organic sales. In addition, Maris's assertion that Biovail could not sustain its organic growth rate was inconsistent with his internal financial model which projected growth from $646 million in 2002 to in excess of $1 billion in 2003.

- It misrepresented without any factual basis that Biovail's R&D expenditures were declining even though Maris's internal financial models show that such expenditures actually increased to $52.2 million in Q2 from $51.5 million in Q1 and to $42.5 million over the prior six month period from $39 million over the same period the prior year, and that in the most recent quarter R&D had been the highest ever quarterly expense.  Moreover, Maris's internal financial model contradicted his assertions by showing $81 million in R&D expenses in Q3 2003 versus $52.2 million in Q3 2002 with a further increase to more than $100 million in 2005.

- It misrepresented without any factual basis that that Biovail's cash flow was negative when, in fact, before discretionary acquisitions cash flow was $772.7 million over the prior four years and $174.2 million in the prior six months.

- It misrepresented without any factual basis that future cash flows would require additional acquisitions.  Indeed, Maris's internal financial model reflected that even without acquisitions Biovail would generate $200 million in EBIT and cash before depreciation in the next six months and over $1 billion by December 31, 2005, and experience earnings growth from 1.78% in 2002 to in excess of 10% in 2003 and 2004.

- It misrepresented without any factual basis that Biovail's key performance metrics significantly lagged those of its peers based on an accounting analysis Maris used that was inconsistent with GAAP.

- It raised materially false and misleading and not reasonably founded concerns about Biovail's credit based solely on Biovail's debt to equity ratio to the exclusion of various other metrics universally considered more instructive on this issue and heavily favoring Biovail, including Biovail's debt to EBITDA, interest coverage, and EBITDA to interest ratios.

- It manipulated the analysis to secure negative results by, among other things, inconsistently including or excluding acquired in process R&D expenses in his financial analysis so as to reach the most negative outcome.

- It misrepresented without any reasonable factual basis that Biovail's low tax rate was not sustainable because it was unusually low compared to purported peer companies.  In fact, none of the purported peer companies were remotely comparable to Biovail in their tax circumstances, history, or structure.  Moreover,

this assertion was materially false and misleading because it failed to even mention that Maris's internal financial model showed Biovail had sustained that tax rate for over three years, publicly available information showed Biovail had sustained that rate since 1994, and other detailed company disclosures showed that Biovail's business had been carefully structured so as to sustain that tax rate.

122.   Third, the report misrepresented that it was the product of Maris's objective, unbiased, and independent analysis when in fact it was created to support the trading positions of substantial short-selling hedge fund clients who Maris sought to please and work with so as to advance his own personal, professional, and financial interest at the expense of Biovail and its investors and employees as well as the other clients at Banc of America Securities who did not enjoy the same special access and influence as those hedge funds.  Nor did the report disclose that Maris was in many instances basically doing little more than rebroadcasting the almost identical and similarly tortured analyses that McCarthy had included in the ghostwritten Camelback reports that the Enterprise members had provided to Maris -- as reflected in the following representative but not exhaustive comparison between Maris's reports and S.A.C.'s Camelback analysis:

| **S.A.C.'s Camelback Reports** | **Maris Reports** |
| --- | --- |
| Describes analysis as **"Earnings Quality Analytics"** | Describes analysis as **"Earnings Quality Analysis"** |
| Claims "**Recent revenue growth**" has "**slowed dramatically**" | Claims "**Recent revenue trends**" have "**significantly slowed**" |
| Claims "**Significant decline in the quality of bottom line earnings**" over a five year **"cumulative"** basis | Claims that "**Biovail's earnings quality has been poor**" over a five year **"aggregate"** basis. |
| Questions "**limited organic growth**" | Questions whether "**company has produced organic growth**" |
| Criticizes decline in "**product sales as a % of total revenue**" and "**increases in non-core revenues**" | Criticizes decline in "**Product sales as a % of total sales**" and increase in "**significant royalties and licensing revenue gains**" |

| **S.A.C.'s Camelback Reports** | **Maris Reports** |
|---|---|
| Criticizes that "**R&D expense has remained flat over the past three years and fallen to 6.6% of the top line revenues in 2002.**" | Criticizes that "**R&D expense as a percentage of revenue was just 6.6% of total revenue in 2002.**" |
| Criticizes the "**large intangible asset balance**" and ratio of "**intangible assets relative to total assets**" | Criticizes "**the amount of intangible assets on Balance Sheet**" and "**intangible assets [ ] as a percent of total assets**" |
| Questions Biovail's "**unusually low**" tax rate "**not sustainable**" because it is "**significantly lower than those reported by all but one of its peers**" | Questions "**Is the unusually low 7% tax rate sustainable?**" because it was "**significantly below its peer group**" |
| Criticizes "**history of unusual transactions and aggressive accounting**" | Criticizes "**history of employing aggressive accounting practices**" |
| Asserts "**Large In-Process Research and Development Charges Distort Earnings**" and "**Frequent In-Process Research and Development Charges Skew profitability**" | Asserts "**In process R&D – why it should be included as R&D**" |
| Claiming aggressive accounting, asserts that "**On December 29, 2000, BVF purchased all the [ ] common shares of IPL . . . Total consideration for the transaction amounted to 204.9 million.**" | Claiming aggressive accounting, asserts that "**On December 29, 2000, Biovail purchased all of the equity of Intelligent Polymers Limited . . . for total consideration of 204.9 million.**" |
| Claiming aggressive accounting, asserts that "**On September 29, 2000 two days before the first scheduled price increase – BVF sold its interest in the company to IPL Acquireco.**" | Claiming aggressive accounting, states that "**On September 29, 2000, just two days prior to the first price hike, Biovail sold its stake in IPL to IPL Acquireco.**" |
| Claiming aggressive accounting, states that "**Three months later, on December 29, 2000 BVF purchased all the voting common shares of IPL Acquireco.**" | Claiming aggressive accounting, states that "**On December 29, 2000, less than three months later, Biovail purchased all common shares of IPL Acquireco.**" |
| Claiming aggressive accounting, states that "**the product rights were immediately expensed as IPRD – which was essentially ignored by the analyst community**" | Claiming aggressive accounting, states that expensing of IPL-Acquireco R&D was "**dismissed as non-recurring by the analyst community**" |

| **S.A.C.'s Camelback Reports** | **Maris Reports** |
|---|---|
| Claiming aggressive accounting, states that that "**BVF paid $43.1 million to Pharma Tech to terminate the development of certain products, recording the payment as an in-process research and development charge**" | Claiming aggressive accounting, states that "**BVF also incurred a non-cash charge for acquired research and development of $43.1 million related to a termination of a development agreement that BVF previously had with Pharma Tech.**" |
| Warns "**Although free cash flow rebounded in Q1 2003, we do not believe this trend is sustainable. In this regard, in order to continue to produce the level of sales growth to which BVF investors have become accustomed, the comparatively low level of Q1 product rights acquisitions cannot last.**" | Warns "**While FCF trends in 2003 show an improvement, this is too short a data set to judge any true progress or trend in our opinion.  We believe that in order to continue to generate the robust earnings growth BVF investors are accustomed to, the product company will likely have to make additional product acquisitions.**" |
| Criticizes questionable "**company loans to officers**" and the purchase of an airplane "**from an entity controlled by Melnyk**" | Criticizes "**company loans to management and the purchase of a corporate jet from CEO.**" |

123.    As set forth more fully above, these accounting and other criticisms were materially false and misleading, were not reasonably based, and were not honestly-held beliefs based on objective analysis but were result-oriented advocacy offered to appease certain hedge fund clients of the bank for Maris's own personal, professional, and financial benefit.   That Maris's accounting focus was not the product of good faith is further evidenced by Maris's failure to raise like concerns with other similarly-situated companies or ever again revisit these issues in a similar manner in any future Biovail report.

124.    Finally, Maris's report misrepresented that he had conducted a personal investigation into the truck accident that had precipitated Biovail's early October earnings warning, and makes the absolutely unfounded accusation that the truck was "empty."   More significant, Maris misrepresented that he had investigated the accident without disclosing that he was simply rebroadcasting without attribution assertions made to him by short-selling Enterprise

member Itros Capital which he understood was, like S.A.C., shorting Biovail stock and provided Maris with the negative information concerning the truck accident so that he would "rebroadcast" it to the market.  At the time, Itros Capital was likewise collaborating with S.A.C. concerning the same issues and the Itros Capital fund manager involved would later go on to work for the S.A.C. Healthco managers and defendants Arthur Cohen and Joseph Healey.

125.    Maris's premeditated and biased reports not only made a mockery of any pretense of independent analysis, but his manufactured reports -- intended to assist specific short-selling clients in their trading strategies -- directly violated the representations made in those Banc of America Securities reports, which promised:  "Any opinions, projections or forecasts in this report are, unless otherwise stated, those of the author and do not represent the views of the issuer or any other person. . . . This report is issued without regard to the specific investment objectives, financial situation or particular needs of any specific recipient."

126.    Maris's October 8 and 10, 2003 reports received substantial attention in the press and financial markets due in large part to Maris's and McCarthy's aggressive promotion.  Indeed, McCarthy praised Maris for the report in an October 9, 2003 e-mail and reported that he was using the report to pressure other analysts to likewise downgrade Biovail.  Maris worked aggressively to get other market participants to publicize, rebroadcast, and adopt the materially false and misleading accusations in his report and obsessively monitored the report's minute-by-minute impact on Biovail's stock price and the substantial media and investor attention he was generating.  In addition, Maris collaborated with McCarthy, Arthur Cohen, Healey, and other Enterprise members on his plans to release an extended version of the October 8, 2003 report two days later for the purpose of maintaining the downward pressure on the stock around this time.  Maris also informed others that he "would like to contact the FBI, SEC, and local

authorities" to discuss his criticisms of Biovail's accounting in the hope that doing so would result in the initiation of regulatory investigations and even further downward pressure on Biovail's stock.

127.    Immediately upon the release of these two putative research reports, Maris had his staff send a constant stream of reports on the stock price movement and whether it was going down as he plainly hoped.

### 8.    The Bogus October 7, 2003 Camelback Report

128.    The day before Maris issued his initial misleading report, McCarthy also had Camelback issue a new report falsely accusing Biovail of "reversing Prilosec royalties reported in an earlier period."  This report was categorically false because Biovail had never booked or reported any such royalties in any prior quarter or, therefore, reversed any prior reported royalties.

129.    The market reaction to early-October 2003 Maris and Camelback reports was an unmistakable 14% additional drop in the stock price, on enormous trading volumes.

### 9.    Maris's October 30, 2003 Ambush

130.    Prior to Biovail's October 30, 2003 Q3 earnings call, Maris was informed of misappropriated confidential non-public information that Melnyk had used his securities account at UBS in some form of financing arrangement.  Armed with that information, on the company's October 30, 2003 investor conference call concerning its third-quarter earnings, Maris asked Melnyk whether he had "sold any stock or entered into any agreement such as loans where the stock is pledged like collars or derivative structures."  Melnyk correctly answered no.  Maris's question was irrelevant to Biovail's third quarter performance that was the subject of the call, and was intended solely to falsely suggest that Melnyk was surreptitiously monetizing his Biovail

holdings without disclosure.

131.    That same day, McCarthy congratulated Maris on his role in turning investor sentiment against Biovail.  In an e-mail, he notified Maris that because of their efforts "the chat room has turned" with posters citing Maris's accounting attacks -- which McCarthy and other members of the Enterprise were aggressively rebroadcasting -- as the reason not to invest in Biovail because "it is impossible to give a valuation floor for bvf as we have no clues what [Biovail's accounting] is hiding."  The next day, defendants Maris and Vickrey  criticized Biovail's accounting and investment value in the Ottawa Citizen newspaper.  That same day, hedge fund Balyasny Asset Management, which was also shorting the stock, wrote Maris "thanks for your help again," and provided Maris with a detailed negative analysis of Biovail's accounting for Maris's future use and rebroadcast.  As he had hoped, numerous short-selling hedge fund clients congratulated Maris and his bosses on the impact of report.

### 10.    The Bogus October 30, 2003 Camelback Report

132.    The same day as Maris's questions about collars and derivatives, McCarthy and the Camelback Defendants issued an October 30, 2003 report that falsely cited the large amount of Wellbutrin XL shipped out at the end of the quarter as evidence "of channel stuffing."  In fact, however, as McCarthy and the Camelback Defendants well understood, the demand for Biovail's Wellbutrin XL product was enormous and far exceeded Biovail's supply such that any suggestion of "channel stuffing" was beyond specious.

133.    Likewise, the Camelback report again falsely accused Biovail of creating an off-balance sheet vehicle to hide R&D costs when in fact the vehicle they were discussing was being consolidated on Biovail's books.  Finally, Camelback alleged "aggressive accounting" against Biovail despite the fact that Ernst & Young had approved its financial statements for both years

and without regard to numerous instances in which Biovail elected conservative accounting positions than was necessary.  The Camelback report was immediately forwarded to Maris.

134.   At or around the end of October, McCarthy arranged for a meeting between the Camelback Defendants and Steven Cohen's right-hand man Matt Grossman and other senior S.A.C. officials about expanding Camelback's work for S.A.C. based on the successful work on Biovail and other "hatchet jobs."  During that meeting, the S.A.C. representative made it clear that the senior levels of S.A.C. management were aware of, and pleased with, the work Camelback had done for S.A.C. on Biovail and other hatchet jobs and were interested in using the Camelback Defendants to issue similar reports on other companies going forward.

### 11.   Defendants' Pressure on Analysts

135.   Despite Maris's effective attack, many uncorrupted analysts correctly declared that the third quarter miss was not indicative of any fundamental problems with Biovail's business or potential.  One such analyst worked for J.P. Morgan.  During a conference call with investors, a person representing that he was a class action plaintiff's attorney asked the analyst to comment on his potential legal liability to investors based on the price drop that had already occurred and might occur in the future in the face of his positive recommendations.  Like McCarthy's promotion of the Camelback and Maris reports, such conduct was obviously intended to intimidate the analyst into downgrading his recommendation to the benefit of short sellers or class action lawyers, or both.

### 12.   Maris Falsely Accuses Melnyk of Lying

136.   At the same time, questions, rumors, and uncertainty generated by Maris's question to Melnyk about collars and derivatives became so severe that Melnyk elected to voluntarily disclose that while he had not entered into any collar, derivative, or any other

instrument to effectively insulate him from risk with respect to the price of Biovail stock, he had taken a loan from UBS that was secured by his UBS securities account, including his Biovail stock.   Although this disclosure put to rest any of the concerns that Melnyk was indirectly reducing his financial stake in Biovail, Maris nevertheless used it as an opportunity to launch yet another attack.   Ignoring the obvious fact that the disclosed loan was fundamentally different from the collar and derivative transactions Maris had asked about, on November 10, 2003, Maris issued a "research comment" falsely asserting that Melnyk had essentially lied in his response to Maris's questions.   By the end of November, Biovail's stock price sunk to a five-year low. Melnyk ultimately sold $49 million worth of stock to pay back the loan.  Maris promptly issued a report citing the insider stock sale as a cause for concern.

### 13.   The SEC Investigation

137.   In addition to aggressively promoting his negative coverage of Biovail and preparing additional negative coverage in collaboration with S.A.C. and other short-selling hedge funds, the defendants pursued Maris's stated plan of contacting regulatory authorities by directly or indirectly communicating to them the accounting issues raised in Maris's October 8 and 10, 2003 reports.   In doing so, they did not, however, inform the regulators that Maris had badly distorted the accounting analysis of his purported experts, plagiarized S.A.C.'s Camelback reports, rebroadcast information he had received about the truck accident from a hedge fund also shorting Biovail stock, or collaborated closely with S.A.C. and other Enterprise members and permitted them substantive input into his reports and knowledge about the timing of the release of those reports.

138.   The SEC subsequently opened an informal investigation into Biovail and requested that Maris send them a copy of his report.   Very shortly after receiving this request,

Jesse Eisinger of The Wall Street Journal, alerted by someone that the investigation had been announced and Maris had received a request for his report, called Biovail for comment so quickly Biovail had not even been notified by the SEC that it intended to investigate Biovail. The next day, Eisinger reported that the investigation had been prompted by Maris's report, of which the SEC had asked for a copy.  Other media outlets likewise reported that the investigation had been prompted by criticism of Biovail's accounting from "analysts and professors."

139.    On November 21, 2003, Maris issued a research note on the investigation and falsely accused Biovail of failing to disclose the investigation until The Wall Street Journal forced them to disclose it.   Other analysts would not issue notes or comments about the investigation until the following days, including Camelback, which at McCarthy's direction issued a report echoing Maris's comments on the investigations and Melnyk's responses to his questions concerning collars and derivatives.

140.    The news and Enterprise reports on the investigation caused Biovail's stock value to decline another 21% and even analysts supportive of Biovail reported that Biovail was "dead money" until the SEC investigation was completed.

**14.    Other Evidence of Maris's Bias**

141.    Maris's anti-Biovail agenda continued to manifest itself in numerous other ways as well.  For example, Maris repeatedly ignored Banc of America Securities' own guidelines requiring an upgrade of a sell rating after a stock had fallen within certain ranges of the sell recommendation's target price.   In addition, when forced by Banc of America Securities to comply with these requirements, Maris would elect to arbitrarily and without any good faith basis to lower the target price to maintain a sell rating.  Thus, for example on December 10, 2003, Maris's assistant David Lohman informed his team that Maris would want to reduce the

Biovail target price on his next report, not based on any changed or updated valuation analysis, but solely because a lower target price would be necessary under Banc of America's guidelines to maintain the sell rating to which Maris was committed.  Thus, Maris's reports plainly and materially misrepresented that his sell rating was based on whether his objective analysis suggested a target price below the current share price when, in fact, it was the desire to make a sell recommendation that drove Maris's target price.

142.   Maris's comments during this period likewise revealed the strong personal agenda in his work.  For example, when McCarthy forwarded to Maris an article complimentary of Melnyk, Maris responded that he was "now over the bowl."  And, far worse, when McCarthy forwarded an article whose sole subject was Melnyk's wife and daughters, Maris responded "this makes me want to vomit."

**15.   <u>Defendants' Continuing Activity</u>**

143.   In mid-January, Biovail stock began to recover, precipitating increased frenzied communications between Maris, S.A.C., and the other Enterprise members, who then collaborated on getting Rocker Partners' media outlet TheStreet.com to issue an article again questioning the circumstances surrounding the October 3, 2003 truck accident.  On January 14, 2004, Maris e-mailed an article entitled "More Questions than answers from Biovail" from TheStreet.com to S.A.C. manager Jon Weiner.  The next day, McCarthy and a member of Maris's staff collaborated about the article and how it might be used, and Weiner e-mailed "call me, I know why it [Biovail] is up."  Despite these efforts, on January 19, 2004, a panicked McCarthy e-mailed Maris to report that he was "getting run over" by the still-recovering Biovail stock price, and to request a call between Maris, McCarthy, Healey, and Cohen.  During that call, Maris assured S.A.C. -- as he did other Enterprise members and legitimate investors -- that he

was preparing additional negative research and intended to do so until Biovail stock declined substantially.  The rise in Biovail stock stalled the same day as that conversation, as Maris had predicted, and traded down to below the levels at which it was priced before the run-up.  On January 20, 2004, McCarthy wrote Maris to thank him: "[Y]ou don't know how much that helped.  [T]hanks!  Ahhhhhh.  Good things."

144.    Under the unrelenting pressure of the defendants, including the completely biased and result-oriented negative reports Maris issued at every opportunity to further the Enterprise's and his personal objectives, by March 2004, Biovail stock had declined over 58% to below $20 from over $50 less than a year earlier.  Pleased with the enormous gains S.A.C. had made on this drastic decline, the S.A.C. Defendants, including Steven Cohen, called Bettis, Vickrey, and others at Camelback to congratulate them for their good work and express S.A.C.'s desire for more negative reports on companies S.A.C. was shorting.  Likewise, numerous hedge funds shorting Biovail praised Maris's efforts.

145.    Although the price of Biovail stock had declined substantially, S.A.C., the Camelback Defendants, Maris, and other Enterprise members would continue to launch attacks to further depress the price and generate volatility in which to execute short-term trading strategies.  For example, on March 4, 2004, more than 700,000 shares of Biovail stock were shorted.  The next day, Maris issued another negative report on Biovail and Moody's downgraded Biovail's debt rating based on what the Moody's analyst would later describe as a never before experienced flood of phone calls pressuring him for a downgrade.

146.    Likewise, on March 9, 2004, millions of shares were being offered for sale short and there were many extremely short term put options purchased in the obvious expectation that Biovail stock was about to experience immediate downward pressure.  That same day Maris

released a report warning of previously-unexpected generic competition from unnamed competitors, and two days later the Canadian press issued a story rehashing Maris's prior year's criticisms of Biovail.

147.     The defendants' scheme continues to the present day with respect to Biovail and other targeted companies.

## E.     Scienter

148.     As alleged herein, defendants acted with scienter in that defendants knew that the statements and documents that were issued and disseminated concerning Biovail and its stock were materially false and misleading; knew that such statements and documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the United States securities laws.

149.     At all relevant times the stock of Biovail traded in an efficient market that properly digested current information regarding Biovail from all publicly-available sources and reflected such information in the Biovail stock price.  Under these circumstances, all sellers of Biovail securities during the Class Period suffered similar injury through their sale of Biovail securities at artificially depressed prices, and a presumption of reliance applies.

## F.     Loss Causation/Economic Loss

150.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by plaintiff and the Class.

151.     During the Class Period, plaintiff and the Class sold securities of Biovail at artificially depressed prices and were damaged thereby.  The price of Biovail stock declined as a result of the misrepresentations disseminated to the market by the defendants and have yet to

fully recover from the defendants' ongoing fraudulent scheme, the existence of which has only recently come to light.

## COUNT I

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

152.    Plaintiff restates each and every allegation of paragraphs 1 through 152 as if fully set forth herein.

153.    During the Class Period, defendants carried out a  plan, scheme and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public regarding Biovail's business, operations, management and the intrinsic value of Biovail securities; and (ii) cause plaintiff and other members of the Class to sell Biovail securities at artificially depressed prices.

154.    In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually, took the actions set forth herein.  Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers and sellers of the Company's securities in an effort to cause and maintain artificially low market prices for Biovail's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

155.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to generate and disseminate false and misleading material

information about the business, operations and future prospects of Biovail as set forth herein.

156.    The defendants employed devices, schemes and artifices to defraud, and engaged in practices, and a course of conduct as alleged herein, in an effort to depress the market price of Biovail securities through the generation and dissemination of untrue statements of material facts and the omission of material facts necessary to make the statements made about Biovail and its business operations and future prospects not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of conduct that operated on a fraud and deceit upon the sellers of Biovail securities during the Class Period.

157.    The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  Such defendants' material misrepresentations and/or omissions were done knowingly and/or recklessly for the purpose of falsely portraying Biovail's business operations and future prospects to the investing public and artificially driving down the price of Biovail's publicly-traded securities.

158.    As a result of the dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Biovail securities was artificially depressed during the Class Period.  In ignorance of the fact that market prices for Biovail's securities were artificially depressed, and relying directly or indirectly on the false and misleading statements of the defendants, or upon the integrity of the market in which the securities trade, plaintiff and the other Class members sold Biovail securities at artificially depressed prices and were damaged thereby.

159.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had plaintiff and the

other members of the Class and the marketplace known the truth concerning defendants' misrepresentations and omissions concerning Biovail's business and its future prospects, plaintiff and other members of the Class would not have sold shares of Biovail stock or, if they had, they would not have done so at the artificially depressed prices they received.

160.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their respective sales of Biovail securities during the Class Period.

## DEMAND FOR JURY TRIAL

162.    Demand is hereby made for a trial by jury for all issues so triable.

WHEREFORE, Plaintiff demands judgment: (a) naming plaintiff as lead plaintiff and certifying the class; (b) awarding plaintiff compensatory damages in amounts to be determined at trial, together with interest, attorneys' fees, costs and disbursements; (c) awarding plaintiff punitive and exemplary damages in amounts to be determined at trial; (d) awarding plaintiff injunctive relief preventing defendants from engaging in continued wrongful activity, as set forth herein, in the form that the Court may determine is just and proper; (e) prejudgment and post-judgment interest; and (f) such other and further relief as is just and proper.

Dated: March 24, 2006

**LAMPF, LIPKIND, PRUPIS & PETIGROW**

By:  _____ /s/ Thomas A. Gentile _____
               Thomas A. Gentile (TG-6939)

80 Main Street
West Orange, New Jersey 07052
(973) 325-2100
Attorneys for Plaintiff
GUY DEL GIUDICE

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO 15 U.S.C. § 78u-4(a)(2)(A)

GUY DEL GIUDICE ("Plaintiff") declares as to the claims asserted in the foregoing complaint under the federal securities laws, as follows:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under 15 USCS §§ 78a et seq.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the class period specified in the complaint, Plaintiff engaged in the following transactions in the security that is the subject of the complaint. On August 19, 2003, Plaintiff purchased 340 shares of the common stock of Biovail at the price of $40.91 per share.  On October 20, 2004, Plaintiff sold his 340 shares of the common stock of Biovail at the price of $19.32 per share.

5.    During the 3-year period preceding the date of this certification, Plaintiff has filed no other action under 15 USCS §§ 78a et seq. in which Plaintiff has sought to serve as a representative party on behalf of a class.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's *pro rata* share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 24th day of March, 2006.

GUY DEL GIUDICE